## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 07-80435-CIV-HURLEY/HOPKINS

**MICHAEL S. POWELL,**

       **Plaintiff,**

**vs.**

**THE HOME DEPOT U.S.A., INC.,**

       **Defendant.**

_____/

### OMNIBUS ORDER AND MEMORANDUM OPINION CONTAINING
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** for patent infringement was tried before a jury, which found that Defendant The Home Depot U.S.A., Inc. ("Home Depot") willfully infringed claims 1, 2, 4, and 5 of U.S. Patent No. 7,044,039 (the "'039 patent"). After the jury returned its verdict, the court held a bench trial, from February 24, 2010 to February 25, 2010, on the single issue of whether Plaintiff Michael S. Powell ("Powell") engaged in inequitable conduct when he applied for the '039 patent. The court also conducted an hearing on May 10, 2010 on a series of post-trial motions filed by the parties, including Powell's motions for attorneys' fees and prejudgment interest and to enhance damages based upon the jury's finding of willfulness.

Having reviewed the evidence admitted at the bench trial and hearing and considered the arguments of counsel, the court concludes that: (1) the '039 patent is not unenforceable due to inequitable conduct, and (2) an award of enhanced damages in the amount of $3 million, attorneys' fees in the amount of $2.8 million, and prejudgment interest in the amount of $3,150,889.13 is warranted. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the court makes

the following findings of fact and conclusions of law.

## BACKGROUND

Powell is a principal of Boldstar Technical, LLC.[1]  In July 2004, Home Depot approached Powell, with whom Home Depot had a longstanding business relationship, to discuss a serious safety problem: the radial arm saws used in its stores by employees to cut lumber for customers were unnecessarily dangerous, causing serious and permanent injuries to employees and resulting in significant liability.  After learning about Home Depot's problem, Powell developed "Safe Hands," a box-like apparatus designed to enhance the safety of the particular arm saws used by Home Depot. The apparatus had two principal benefits: first, it prevented the operator of the saw from touching the saw blade, thus preventing, and almost eliminating, the threat of injury from the blade; second, it captured runoff sawdust, the inhalation of which is potentially harmful.  Powell filed a patent application for the invention, and on May 16, 2006, the United States Patent and Trademark Office ("PTO") issued the '039 patent.

Powell presented Safe Hands to Home Depot, which agreed to purchase test units for eight of its stores and promised to purchase more if the product performed well.  Safe Hands proved successful, but Home Depot and Powell were unable to agree on a bulk price for the device.  Home Depot reached out to another company, Industriaplex, Inc. ("Industriaplex"), to develop a saw guard and purchased Industriaplex's device for all of its stores.[2]

Powell filed this lawsuit on May 17, 2007, alleging that Home Depot willfully infringed

---

[1]  Boldstar was formerly a plaintiff in this action, but was dismissed with prejudice by court order dated May 28, 2008.  *See* DE # 222.

[2]  Industriaplex was formerly a defendant in this action, but was dismissed with prejudice based upon private settlement agreement.  *See* DE # 550.

claims 1, 2, 4, and 5 of the '039 patent, among other causes of action.  Home Depot denied infringing the patent and asserted several counterclaims, including one for unenforceability due to inequitable conduct.

The jury trial in this matter began on February 1, 2010.  After opening arguments, the court granted Powell's motion *in limine* to bifurcate Home Depot's inequitable conduct counterclaim for bench trial following the conclusion of the jury trial. On February 24, 2010, the jury found that Home Depot wilfully infringed Powell's patent and awarded Powell $15 million in damages in the form of a reasonable royalty.  The court then held a two-day bench trial on Home Depot's assertion that the '039 patent is unenforceable due to inequitable conduct.  On March 8, 2010, the court ruled that Home Depot failed to establish inequitable conduct by clear and convincing evidence and reserved jurisdiction to explicate its findings of fact and conclusion of law.  After that ruling, the parties filed a series of post-trial motions, on which the court held a hearing.

## DISCUSSION

### A.   Inequitable Conduct

Home Depot asserts that the '039 patent is unenforceable due to inequitable conduct for two reasons.   First, Home Depot contends that Powell intentionally failed to disclose material information to the PTO when he applied for the '039 patent.  Second, Home Depot argues that Powell intentionally made a false statement in a petition to make special, which prompted the PTO to improperly expedite review of his patent application.

### 1.   Findings of Fact

### a.   Genesis of Safe Hands

1.   In early 2004, Home Depot's Chief Executive Officer expressed concern about the

safety of the radial arm saws employees used to cut wood for customers, and directed company executives to either make the saws safer or remove them from all stores.

2.     On May 11, 2004, Powell met with Chad Phillips, a Home Depot procurement leader, who informed Powell about Home Depot's problem with radial arm saws and the CEO's directive. Mr. Phillips did not specifically ask Powell to address Home Depot's problem.

3.     After the May 11, 2004 meeting, Powell began thinking about ways to make Home Depot's radial arm saws safer.

4.     By May 14, 2004, Powell developed a promising safety device – a prototype saw guard designed to be used with the radial arm saws in Home Depot stores.  He called the device "Safe Hands."

                    b.    *The Original Saw Company*

5.     Powell demonstrated Safe Hands to Mr. Phillips, who expressed interest in the device's promise, but explained that Home Depot had asked The Original Saw Company ("Original Saw"), the company from which Home Depot purchased radial arms saws, to develop a saw guard.

6.     Mr. Phillips told Powell that Home Depot would consider both Powell's and Original Saw's devices, and would purchase the superior product.

7.     Several weeks later, Home Depot asked Powell to demonstrate his invention to key Home Depot employees.  The meeting was scheduled for July 1, 2004 at Home Depot's Product Line Review (PLR) facility in Atlanta, Georgia.

8.     When Powell visited the PLR facility on July 1, 2004, he saw the prototype saw guard developed by Original Saw.

9.     Powell testified that he remembered the Original Saw device as a yellow, L-shaped

4

bent piece of metal, affixed to a radial arm saw, with open sides.

10.     Allen Eden, Original Saw's Vice-President, testified that the Original Saw device was the result of an experiment, was ultimately abandoned, and was not circulated to the public.

11.     When he later applied for the '039 patent, Powell disclosed numerous prior art references.  Powell did not, however, disclose Original Saw's saw guard to the PTO.

12.     Home Depot claims that Powell intentionally withheld reference to the Original Saw device and that a reasonable patent examiner would find such information important in assessing the novelty of the '039 patent.

13.     On August 4, 2004, Home Depot purchased eight Safe Hands units from Powell to test the device's performance.

14.     Home Depot indicated that it would purchase Safe Hands units for all of its stores if the eight test units performed well.

15.     On August 31, 2004, Powell filed Patent Application No. 10/930,928 for the Safe Hands invention.

16.     On September 13, 2004, Home Depot offered to purchase Safe Hands in bulk from Powell for $1,200 per unit.  Powell did not accept the offer, because his per-unit cost of production exceeded $1,200.  Home Depot advised that it might be willing to increase its offer.

17.     Over the next couple weeks, Powell and Home Depot continued to discuss the purchase and sale of Safe Hands units.  The parties, however, did not reach an agreement, and Powell never countered Home Depot's offer of $1,200.

18.     On September 27, 2004, Powell emailed Mr. Phillips regarding the parties' negotiation.  Mr. Phillips's reply email explained that negotiations were stalled.

19.     After September 27, 2004, Powell suspected that Home Depot might take action that would infringe his patent, once issued.

20.     On October 4, 2004, Powell sent Mr. Phillips an email, "in order to advise [him] of potential liability for patent infringement."  In the email, Powell generally explained the claims of the patent application, offered to supply a copy of the patent if Home Depot were to sign a non-discolsure agreement, and offered to have his attorney speak to Home Depot's legal department regarding "any patent infringement areas The Home Depot may be approaching."

21.     On October 6, 2004 and October 15, 2004, Powell sent followup emails to Mr. Phillips.  Mr. Phillips did not respond.

22.     On November 9, 2004, Mr. Phillips contacted Powell and requested an emergency meeting, which took place the following day.  During the meeting, Mr. Phillips informed Powell that Home Depot was using a copy of Safe Hands in its Sandy Plains store.

23.     On November 10, 2004, Powell's business partner visited the Sandy Plains store, where he saw what he believed to be a copy of Safe Hands.

### c.     Petition to Make Special

24.     On October 25, 2004, Powell submitted a Petition to Make Special (the "Petition") to  the PTO pursuant to Section 708.02(I) of the Manual of Patent Examining Procedure.  The Petition asked the PTO to expedite review of Powell's patent application based upon "prospective manufacture."

25.     In support of the Petition, Powell submitted a sworn declaration.  The declaration contained the following statements:

a.     "I make this declaration in support of a petition to make special for

advancement of the examination of my application on the basis of prospective manufacturer pursuant to M.P.E.P § 708.02."

        b.    "I confirm that Boldstar Technical, LLC, a Florida Limited Liability Corporation, headquartered in Boca Ration, Florida, is a prospective manufacturer having presently available capital in excess of $1,000,000.00, and a manufacturing facility located in Buford, Georgia having the necessary CNC machines and other machine tools, to manufacture the invention in quantity."

        c.    "Boldstar Techincal, LLC has manufactured a limited number of the invention, but will not increase present manufacture unless certain that a patent will be granted."

        d.    "Boldstar Technical, LLC has obligated itself to manufacture the invention in the United States in quantity immediately upon the allowance of claims or issuance of a patent which will protect the investment of capital and facilities.

        e.    "I have caused to be made a careful and thorough search of the prior art, and have a good knowledge of the pertinent prior art."

26.    On July 28, 2005, the PTO granted the Petition and stated that "the examiner will treat [Mr. Powell's] application as special throughout its prosecution."

27.    Home Depot contends that Powell's Petition misled the PTO in two ways.  First, Home Depot argues that Powell filed the Petition based on "prospective manufacture," when the real impetus behind the Petition was Powell's belief that Home Depot was using or buying infringing devices.

28.    In support of this argument, Home Depot contends that Powell suspected Home Depot's infringing activity at the time he filed the petition.  Home Depot also cites a deposition taken

on April 22, 2008 in which Powell testified that he filed the petition because "there was an infringer was out there."

29.     After the April 22, 2008 deposition, Powell filed a errata sheet pursuant to Fed. R. Civ. P. 30(e) to correct his deposition testimony.  Therein, Powell explained that he "was mistaken in [his] original testimony," and clarified that he actually filed the Petition because he "felt that there was a real potential and likelihood that purchase orders [from Home Depot] were forthcoming." Powell explained the reason for the mistake: During the April 22, 2008 deposition, he confused the Petition filed in support of the '039 patent with a petition to make special based on infringement filed in support of an unrelated patent.

30.     During the bench trial, Powell testified consistent with his errata correction and produced the other petition to make special, which Powell filed within one month of the Petition at issue here.  The other petition to make special was submitted in connection with U.S. Patent Application No. 10/993,689, which matured into U.S. Patent No. 7,171,880.

31.     Second, Home Depot argues that Powell made the following false statement in the declaration with the intent to deceive the PTO: that Powell "obligated itself to manufacture the invention."

32.     Home Depot argues that, while the parties discussed the purchase and sale of Safe Hands units for all Home Depot stores, no contract was ever reached, and thus Powell was not obligated in any sense to manufacture Safe Hands for Home Depot.

    *2. Conclusions of Law*

      *a. Inequitable Conduct Standard*

33.     Every patent applicant owes a duty of candor and good faith to the PTO.  37 C.F.R.

§ 1.56(a); *Avid Identification Syss. Inc., v. Crystal Imp. Corp.*, 2010 WL 1659143, at *5 (Fed. Cir. Apr. 27, 2010). "A breach of this duty constitutes inequitable conduct, which will invalidate a patent in its entirety." *Arrow Int'l, Inc. v. Spire Biomedical, Inc.*, 635 F.Supp.2d 46, 57 (D.Mass. 2009). An accused infringer alleging inequitable conduct must prove by "clear and convincing evidence that the patent applicant (1) either made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1366 (Fed. Cir. 2008).

34.     The Federal Circuit has cautioned that the "need to strictly enforce the burden of proof and elevated standard of proof in the inequitable conduct context is paramount because the penalty for inequitable conduct is so severe." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008). Thus, even when an accused infringer proves materiality and intent to deceive by clear and convincing evidence, the court "must still balance the equities to determine whether the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable." *Id.*  Under the balancing test, "[t]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

35.     Materiality may be judged by the reasonable examiner standard. *Dako*, 2009 WL1083446, at * 18. Under that standard, materiality "embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (emphasis in original). Material information "is not limited to prior art."

*Id.* Thus, a false statement is made in a petition to make special is material if "it succeeds in prompting expedited consideration of the application." *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed. Cir. 1994). "A misstatement or omission may be material even if disclosure of that misstatement or omission would not have rendered the invention unpatentable." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1318 (Fed. Cir. 2006).

36.     Intent to deceive is usually "proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998). "However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). Moreover, any "inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Star Scientific*, 537 F.3d at 1366.

> b.      *Home Depot Failed to Prove Inequitable Conduct by Clear and Convincing Evidence*
>
> > 1.      *Petition to Make Special*

37.     Home Depot argues that Powell intentionally misled the PTO by filing the Petition based upon prospective manufacture. Home Depot asserts that Powell actually filed the Petition because he believed Home Depot had begun using a copy of his invention.

38.     The court concludes that Home Depot has not shown by clear and convincing

10

evidence that Powell misled the PTO by filing the Petition based upon prospective manufacture. Although Powell testified at a deposition that he filed the Petition due to possible infringement, his errata sheet and trial testimony credibly explain that he had confused the Petition for the '039 patent with a petition to make special filed around the same time for another patent.  Moreover, the record demonstrates that, at the time Powell filed the Petition, he still expected that Home Depot would purchase Safe Hands from him for all of its stores.  Indeed, Powell not did learn about Home Depot's infringement until November 10, 2004, approximately two weeks after he filed the Petition.

39.    Home Depot argues that Powell made the following false statement in the Petition: that he had "obligated" himself to manufacture Safe Hands in quantity immediately upon the issuance of the '039 patent.  Home Depot claims that parties never reached an agreement for the purchase and sale of Safe Hands, and thus Powell was under no obligation.

40.    The court finds that Home Depot has not shown by clear and convincing evidence that Powell's assertion of an obligation  was intentionally false at the time he submitted the Petition. At that time, Powell had supplied Home Depot with eight test units, had received an offer from Home Depot to buy approximately 2,000 more units, and had engaged in contract discussions with Home Depot's procurement department.  Thus, although Powell had no contractual obligation to supply Safe Hands to Home Depot, Powell, a long-time business partner of Home Depot, reasonably believed he was obligated to produce large quantities of Safe Hands when the parties finalized their contract discussions.

41.    However, the record is clear that Powell learned, as of November 10, 2004, that Home Depot was using a copy of his invention and that he was no longer obligated to Home Depot in any sense of the word.  At that time, Powell was required, by virtue of his continuing duty to

11

notify the PTO about any changes in his application, to inform PTO that his Petition contained a statement that was no longer accurate. *See Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1991) ("The duty of candor extends throughout the patent's entire prosecution history."). He did not, however.

42.    The single most reasonable inference able to be drawn from Powell's failure to notify the PTO about the termination of his obligation is that he intended to deceive the PTO into accelerating review of his patent application.

43.    Since the PTO granted the Petition and handled Mr. Powell's patent application in an expedited fashion, the court also finds that Powell's failure to apprise the PTO about the change in the Petition was material. *See Samick*, 19 F.3d at 1411 (false statement made in a petition to make special is material if "it succeeds in prompting expedited consideration of the application").

44.    Having found that Powell intentionally and materially deceived the PTO, the court proceeds to balance the equities to assess the egregiousness of his conduct.   After careful consideration, the court finds the materiality of the misstatement and Powell's level of intent to be relatively low.  The five-paragraph declaration filed in support of the Petition contained only a single misstatement, which had no bearing on the patentability of Safe Hands.   And although the misstatement prompted the PTO to improperly accelerate review of Powell's application based upon prospective manufacture, it appears that Powell would have qualified for expedited review anyway based upon infringement pursuant to Section 708.02(II) of the Manual of Patent Examining Procedure.  Thus, on balance, the court finds that Powell's conduct was not so offensive as to warrant holding his patent unenforceable.

### 2.    Failure to disclose the Original Saw Device

45.    Home Depot also argues that Powell intentionally failed to disclose the saw guard developed by Original Saw to the PTO and that the nondisclosure was material.

46.    As an initial matter, the court notes that Original Saw's device was experimental and never perfected, and thus was not prior art.  *See Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1558 (Fed. Cir.1985) ("[A]nother's experiment, imperfect and never perfected will not serve either as an anticipation or as part of the prior art, for it has not served to enrich it.").

47.    However, materiality embraces not just prior art, but any information that a patent examiner would consider important in deciding whether to grant a patent.  Here, Home Depot has met its burden of proving that a reasonable patent examiner would consider the Original Saw device important to the determination of inventorship and novelty, perhaps among other things.  Thus, Powell should have disclosed the Original Saw device to the PTO, even if the question of materiality was close, *see LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1361 (Fed. Cir.2001) ("[W]hen a question of materiality is close, a patent applicant should err on the side of disclosure.") and even though the patent was correctly issued, *see Perspective Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1322 (Fed. Cir. 2000) ("[W]hether the inventorship of the patents as issued is correct does not determine the materiality of the statements in this case, just as whether concealed prior art would actually invalidate the patent is irrelevant to materiality.").

48.    Nonetheless, Home Depot has not proven by clear and convincing evidence that Powell intended to deceive the PTO by withholding reference to the Original Saw device.  There is no direct evidence that Powell possessed such an intent, and the only indirect evidence from which an inference of intent to deceive can be drawn is Powell's failure to disclose the Original Saw device.

13

The Federal Circuit, however, has held that "[i]ntent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible." *Dayco*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). Here, Powell has provided a plausible explanation for the nondisclosure: he did not consider the Original Saw device material, because he only saw it once, while it was in experimental form, and shortly before it was abandoned. Thus, Home Depot has not proven by clear and convincing evidence that Powell's failure to disclose the Original Saw device to the PTO amounted to inequitable conduct.

### 3. Conclusion

49. For these reasons, the court finds that Home Depot did not establish by clear and convincing evidence that the '039 is unenforceable due to inequitable conduct.

### B. Enhanced Damages

### 1. Standard

Powell moves the court to triple the damage award of $15 million based upon the jury's finding of willfulness. A court may enhance damages up to three times when there is a finding of willful infringement on the part of an infringing party. 35 U.S.C. § 284. The decision whether to enhance damages is committed to the sound discretion of the court. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1370 (Fed. Cir. 2004). A "finding of willfulness does not require an award of enhanced damages; it merely permits it." *In re Seagate Tech., LLC.*, 497 F.3d 1360, 1368 (Fed. Cir. 2007).

Enhanced damages are a punitive measure taken by a court to penalize a willful infringer for increased culpability. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996). In deciding whether to grant enhancement and the amount thereof, the "paramount determination is the

egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). In *Read*, the Federal Circuit identified nine factors that district courts should consider in deciding whether to enhance damages: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid or not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) closeness of the case; (6) duration of the infringer's misconduct; (7) remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Id.* at 827.

The court will address the nine *Read* factors in turn.

2.    *Analysis of Read Factors*

a.    *Whether Home Depot Deliberately Copied Powell's Invention*

The court finds that Home Depot deliberately and callously enlisted Industriaplex to make copies of Powell's invention and then used the copies in all of its stores. The record demonstrates that, after Powell told Home Depot he was unable to supply Safe Hands units for $1,200, Home Depot refused to negotiate in good faith with him or increase its offer. Rather, in an effort to save money, Home Depot enlisted Industriaplex to examine and copy one of the Safe Hands test units. Rhett Marlow and Peter Murray, Industriaplex's executive and chief engineer, respectively, testified that Industriaplex followed Home Depot's instruction and created a copy of the device. Indeed, the record includes a photograph of Ed Heck, an Industriaplex employee, hovering over and analyzing Powell's invention, with his notepad and pencil by his side.

After Industriaplex creative a virtual copy of Powell's invention, Home Depot began

installing the infringing devices in its stores.  In the meantime, Powell continued to try to sell his invention to Home Depot, while asserting on numerous occasions that he had applied for a patent on his invention.  Home Depot gave Powell the cold shoulder and eventually installed a copy of his invention in roughly 2,000 stores.

Home Depot argues that it enlisted Industriaplex to reverse engineer Powell's invention, rather than copy it.  This argument, however, is convincingly belied by the record and the jury's finding of willfulness.  The court finds that Home Depot instructed Industripalex to deliberately copy Powell's invention.  Thus, this factor tips in favor of enhancement.

> b.    *Whether Home Depot Investigated the Scope of the Patent and Formed a Good-Faith Belief that it was Invalid or not Infringed*

Home Depot has presented no evidence that it investigated the scope of Powell's patent after learning about it, that it possessed a good faith belief that the patent was invalid, or that it believed its conduct did not constitute infringement.  In contrast, the evidence demonstrates that Home Depot instructed Industriaplex to copy Safe Hands, and continued using the copies after it became aware of the '039 patent.  Home Depot's attitude toward Mr. Powell's patent is summarized by a statement made by Tom Single, Home Depot's Vice President of Purchasing, at a meeting when he learned about Powell's patent.  According to a Home Depot employee who attended the meeting, Mr. Single, in a "nonchalant" manner, "flipped his feet up on the desk, expletive deleted, and said, let Mike Powell and them sue us."  The employee testified that the expletive started with the letter "F."  The cavalier and vulgar manner in which Home Depot treated its potential liability for patent infringement weighs in favor of enhancement.

16

c.      *Home Depot's Behavior as a Party to this Litigation*

Powell asserts that Home Depot defended this action vexatiously and in bad faith by, among other things, asserting defenses without any factual or legal basis, producing voluminous and immaterial records in response to discovery requests when simpler and more direct records existed, and presenting false and misleading affidavits to the court.  Home Depot takes issue with Powell's characterization of its conduct, and maintains that it defended against this action vigorously, but also ethically and reasonably.

While the court is mindful that hard-fought, zealous advocacy does not necessarily amount to vexatious or bad faith litigation, *see Finjan Software, Ltd. v. Secure Computing, Corp.*, 2009 WL 2524495, at * 17 (D.Del. Aug. 18, 2009), the court finds that the record is replete with instances of actual litigation misconduct that unnecessarily prolonged this litigation and wasted judicial resources.  For instance, in response to Powell's discovery request for documentation about injuries suffered by Home Depot employees when using radial arm saws, Home Depot inundated Powell with three bankers boxes containing more than six thousand pages of irrelevant data concerning forklift accidents.  A random sample of more than 2,300 of the pages yielded only a single, wholly irrelevant accident involving a radial arm saw, in which an employee fell off a fork lift and fortuitously hit his head on a radial arm saw.  Simply put, nothing in those 6,000 pages had anything to do with this case.  There is no doubt that Home Depot produced those documents in bad faith.

Additionally, Home Depot asserted and vigorously advanced the defense that Richard Marshall, a former Home Depot executive, was the co-inventor of Safe Hands.  When Powell deposed Mr. Marshall, however, he testified that he was not familiar with Safe Hands and was not asserting that he co-invented it.  Additionally, even though Home Depot was unable to produce an

17

iota of evidence in support the defense, it did not withdraw it until after Powell briefed his motion for summary judgment and spent substantial resources investigating and defending against the defense.

The record is clear that Home Depot's misconduct as a party to this litigation was vexatious, mean spirited, and indefensible. Its litigation tactics provoked numerous disputes between the parties, delayed resolution of Powell's claims, and resulted in unnecessary motions practice, not to mention over 700 entries in the court docket. This factor favors enhancement.

### d.     Home Depot's Size and Financial Condition

This factor focuses on the overall financial health of the infringer to ensure that enhanced damages would not prejudice defendant's non-infringing business. *See Creative Internet Adver. Corp. v. YahooA Inc.*, --- F.Supp.2d ---, 2010 WL 446571, at * 6 (E.D. Tex. Feb. 01, 2010). Here, it is undisputed that Home Depot is large, profitable, multibillion-dollar corporation with a substantial domestic and international presence. See Def.'s Resp. (Home Depot concedes that [it] is a large and financially-sound company."). There is no doubt that Home Depot is capable of paying enhanced damages. This factor weighs in favor of enhancing damages.

### e.     Closeness of the Case

Powell argues, and the court agrees, that this was not a close case of infringement and validity. The record is clear that Powell undertook to design a solution to the serious safety problem Home Depot's radial arm saws posed, that Home Depot directed another company to copy Powell's invention, that Home Depot installed and used a virtual copy of Powell's invention in roughly 2,000 stores nationwide, and that Home Depot acted with reckless disregard for Powell's intellectual property rights.

Although Home Depot asserted numerous defenses of invalidity and unenforceability, many of those defenses were suspect and all proved unsuccessful.  For example, Home Depot's assertion of co-inventorship bordered on frivolous; its defense of invalidity based on lack of enablement was dropped at the close of trial, after the court noted that Home Depot presented no evidence on it to the jury; and its defense of invalidity based on obviousness was dismissed on summary judgment. Admittedly, Home Depot's defense of unenforceability due to inequitable conduct was a somewhat close call.  But overall, the issues of infringement and validity were not close.

Moreover, the court has considered other "[p]otential circumstances of a close case [such as jury] deadlock on the issue of infringement during deliberation, or potentially returning a verdict of validity and infringement but agreeing with defendants' valuation of damages."  *See YahooA,*, 2010 WL 446571, at * 7.  In this case, the jury did not deliberate extensively or agree with Home Depot's valuation of damages.  On the contrary, the jury awarded damages in the full amount requested by Powell.  This factor favors enhancement.

*f.*  *The Duration of Home Depot's Misconduct*

The court must next assess the duration of Home Depot's infringement.  The record demonstrates that Home Depot infringed Powell's patent for over four years after its issuance, for over two years after filing of this lawsuit, and up until the moment the jury returned its verdict  The court finds that this factor favors enhancement.

*g.*  *Remedial Action by Home Depot*

This factor looks at whether Home Depot took any remedial action during the pendency of the litigation.  The record in this case indicates that Home Depot continued using the infringing devices at all times during this litigation, and took no remedial action other than ceasing the purchase

19

of new infringing units.  This factor favor enhancement.

h.    *Home Depot's Motivation to Harm Powell*

Powell argues that Home Depot's infringement was motivated by pressures to "save costs" and "preserve its extremely important custom woods cutting market share advantage over its competitors."  Home Depot does not take issue with that characterization, admitting that it was motivated by the "economic pressures" of the marketplace and a desire to decrease injuries caused by radial arm saws, but denies that it intended to harm Powell directly.

An infringer's motivation for infringement may weigh against the enhancement of damages where it was influenced by such economic pressures as customer satisfaction.  *See Read*, 970 F.2d at 827 (citing and quoting *American Safety Table Co. v. Schreiber*, 415 F.2d 373, 379 (2d Cir.1969)).  Because this factor focuses on marketplace conduct, it is less significant where, as here, the parties are not competitors.  *Krippelz v. Ford Motor Co.*, 670 F.Supp.2d 815, 824 (N.D. Ill. 2009).  In this case, the evidence demonstrates that Home Depot's infringement was principally motivated by its economic self-interest, not by a desire to harm Powell.  This factor weighs against enhancement.

i.    *Home Depot's Attempt to Conceal its Misconduct*

Powell contends that Home Depot concealed its infringing conduct both before and after Powell filed this lawsuit.  Specifically, Powell argues that Home Depot purchased eight Safe Hands devices from Powell and represented that more orders would be forthcoming, while at the same time enlisting Industriaplex to copy the device and make infringing units.

Home Depot argues that it made no attempt to conceal its use of the infringing units.  The court agrees.  The infringing units were on public display in over 1900 Home Depot stores nationwide.  *See Nexmed Holding, Inc. v. Block Inv., Inc.*, 2006 WL 1880156, at *2 (D.Utah July 6,

2006) (no concealment where defendants sold infringing "device openly and notoriously").

Additionally, Powell argues that Home Depot concealed "the nature of its conduct throughout this litigation by advancing a cascade of frivolous defenses and counterclaims." This argument is misplaced. Home Depot's conduct as a party to this litigation is more appropriately considered under the third *Read* factor. *Cf. Saint-Gobain Autover USA, Inc. v. Xinyi Glass North Am., Inc.*, 2010 WL 1416688, at *13 ("The Court is unwilling to impute a motive to conceal or hide from a discovery dispute."). The court finds that this final factor weighs against enhancing damages.

### 3. Conclusion

In light of the jury's finding of willfulness and consideration of the *Read* factors, the court concludes that Home Depot's conduct was sufficiently egregious to warrant enhanced damages. In particular, the first seven *Read* factors support enhanced damages, while only factors eight and nine weigh against enhancement. Although the court has discretion to triple the damage award of $15 million, the court finds that the totality of circumstances instead warrants an damage enhancement in the amount of $3 million.

## C.   Attorneys' Fees

The parties have agreed that, should the court determine that Powell is eligible for an award of attorneys' fees, the fee amount should be $2.8 million. In deciding whether to award attorneys' fees, the court must undertake a two-step process. *See Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009). First, "the district court must determine whether [there is clear and convincing evidence that] the case is exceptional." *Id.* Second, "the district court must determine whether attorney fees are appropriate." *Id.* "[O]nly a limited universe of circumstances warrant a finding of exceptionality in a patent case: inequitable conduct before the PTO; litigation

misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Id.*

As explained above, the court finds that Home Depot engaged in exceptional acts of litigation misconduct and vexatious and bad faith litigation. Accordingly, the court will grant Powell's motion for attorneys' fees and award fees in the amount of $2.8 million.

### D. Prejudgment Interest

Powell moves for prejudgment interest pursuant to § 284 of the Patent Code. See 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages . . . together with interest and costs as fixed by the court."). Powell proposes a prejudgment interest of either 6.1% (average prime rate for the applicable time period), 9% (average statutory interest rate on judgments in Florida for the applicable time period), or 15% (interest rate used by Home Depot's damages expert). Home Depot does not dispute that prejudgment interest should be applied to the damage award, but instead disputes "the manner in which Plaintiff requests the Court to calculate prejudgment interest." Home Depot contends that prejudgment interest should be computed using the annual U.S. Treasury Bill, which ranged from .37% to 4.94% during the applicable time period.

Because "an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement," the Supreme Court has held that "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). The interest rate used to calculate prejudgment interest and the frequency of compounding is left to the sound discretion of the district court. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). However, "[i]t has been recognized than an award of

compound rather than simple interest assures that the patent owner is fully compensated." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995).

The court concludes that the interest rates proposed by Powell are too high, while the interest rate proposed by Home Depot is insufficient to fully compensate Powell for the infringement. The court holds that prejudgment interest shall be awarded based on an interest rate of 5.01% (the Federal Post Judgment Interest Rate prevailing on the date of issuance of the '039 patent) compounded monthly from the date of issuance of the '039 patent (May 16, 2006) to the date of judgment (March 8, 2010). Based on this calculation, Powell is entitled to $3,150,889.13 in prejudgment interest.

## CONCLUSION

For the reasons given above, it is hereby **ORDERED** and **ADJUDGED** that:

1.   Home Depot has not proven by clear and convincing evidence that the '039 patent is unenforceable due to inequitable conduct.

2.   Powell's motion for enhanced damages [DE # 701] is **GRANTED IN PART**. The court finds that while Powell is entitled to enhanced damages, an enhancement of three times the damage award is not warranted. Instead, the court hereby awards enhanced damages in the amount of $3 million.

3.   Powell's motion for "reconsideration of the court's oral ruling on plaintiff's motion to treble the damages awarded in this case" [DE # 763] is **DENIED**.

4.   Powell's motion for renewed judgment as a matter of law as to infringement under 35 U.S.C. § 271(f)(1) [DE # 699] is **DENIED**.

5.   Powell's motion for prejudgment interest [DE # 700] is **GRANTED**.

6.   Powell's motion for attorneys' fees [DE # 707] is **GRANTED**.

Omnibus Order and Memorandum Opinion Containing Findings of Fact and Conclusions of Law
Powell v. The Home Depot U.S.A., Inc.
Case No. 07-80435-CIV-HURLEY/HOPKINS

7.      Home Depot's motion for new trial [DE # 719] is **DENIED**.

8.      Home Depot's renewed motion for judgment as a matter of law [DE # 718] is

        **DENIED**.

9.      Home Depot's motion for relief from final judgment [DE # 716] is **DENIED**.

10.     Pursuant to Fed. R. Civ.Pp. 58(a), the court will enter final judgment by separate

order.

        **DONE and SIGNED** in Chambers in West Palm Beach, Florida, this 28th day of May, 2010.


                                        Daniel T. K. Hurley
                                        U.S. District Judge

*Copies provided to counsel of record*

For updated court information, visit unofficial Web site
at http://www.judgehurley.com